# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **DARLENE HIBBEN,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 16-CV-111-JFJ** |
| | ) | |
| **TIM POTTEIGER, individually,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## OPINION AND ORDER

Before the Court is Defendant Tim Potteiger's ("Potteiger") Motion for Summary Judgment (ECF No. 49). For the reasons stated below, Potteiger's Motion is **GRANTED** in its entirety, and Potteiger is entitled to judgment as a matter of law.[1]

## I.      Factual Background

In approximately 2002, Plaintiff Darlene Hibben ("Plaintiff") went to work for the Oklahoma Department of Veterans Affairs ("ODVA"). ECF No. 58-3 ("Pl. Dep.") at 59:23-60:5. Plaintiff began working at the Claremore ODVA facility as a food service worker, and she was promoted through several positions over the ensuing years. *Id.* at 60:3-5, 61:16-18, 65:2-10. In 2010, Plaintiff became a nutrition assistant at the Claremore ODVA facility, and she remained in that position until she retired at the end of 2013. *Id.* at 66:19-24, 67:20-22, 69:17-24; 119:17-23.

On November 9, 2012, Plaintiff requested leave due to stress, and ODVA approved intermittent leave until February 9, 2013. ECF No. 49-2 (letter from Jeri Norvel to Plaintiff); ECF No. 49-3 (Application for Family or Medical Leave dated Nov. 15, 2012). According to Plaintiff, she needed leave because of stress resulting when her supervisor, Mark Hammett ("Hammett"),

---

[1] The parties have consented to all proceedings before a United States Magistrate Judge, *see* ECF No. 18, and any appeal of this decision will be directly to the Tenth Circuit Court of Appeals.

returned from a leave of absence. Pl. Dep. at 67:23-68:3, 150:17-151:8. Plaintiff was upset at Hammett's return because, according to Plaintiff, Hammett had been under investigation for harassment of several employees. *Id.* at 151:1-3. When Plaintiff learned Hammett was returning to work without consequence, "something inside of [her] just kinda snapped because he always said he could get away with whatever he wanted to do." *Id.* at 151:3-8.[2]

On November 29, 2012, Plaintiff's physician released her to return to work. ECF No. 49-5 (Return to Work Slip dated Nov. 27, 2012). In December 2012, Plaintiff attended a meeting at an Eggbert's restaurant in Claremore, Oklahoma, along with State Senator Frank Simpson, other employees from the Claremore ODVA facility, and the wife of a resident who had been scalded at the Claremore ODVA facility. Pl. Dep. at 136:22-137:8, 139:21-140:21. At the meeting, employees discussed conditions at the Claremore ODVA facility, and Plaintiff complained to Senator Simpson about harassment she had received from the ODVA administration. *Id.* at 138:19-139:4; 145:17-20.

Plaintiff voluntarily returned to work on January 14, 2013. *Id.* at 162:13-15. Hammett informed Plaintiff that she was set to meet with him and Defendant Tim Potteiger ("Potteiger") that day. *Id.* at 163:6-16. Plaintiff then called Potteiger by telephone to ask whether she could bring a witness to the meeting, because she was apprehensive about meeting with Hammett. *Id.* at 163:6-10, 163:22-164:10. On the phone call, Potteiger told Plaintiff she could not bring a

---

[2] The record is somewhat unclear as to whether this incident took place in November or December of 2012. *Compare* Pl. Dep. at 151:16-17 (Q: When did she tell you that [Hammett] was coming back? A: It was around the middle of December.") *with id.* at 190:8-14 (Q: Okay. Now, I thought you told me earlier that it was December of 2012 . . . when you learned [that Hammett was coming back]. . . So you think it was November? A: Correct."). It is unnecessary, however, for the Court to determine the exact time frame. Based on Plaintiff's leave request for "stress," which requests leave beginning on November 8, 2012, the Court assumes the stress-inducing incident occurred in November 2012. Further, although the parties appear to agree that Plaintiff requested leave both in November and December of 2012, the record suggests Plaintiff requested leave only once in 2012, following the date of Hammett's return to work.

witness. *Id.* at 164:21-23. Potteiger told Plaintiff she needed to "straighten up" and "knock it off" or she would not be around much longer. *Id.* at 199:22-200:3. Plaintiff interpreted these admonitions to mean, "[c]ome to work and do your job." *Id.* at 200:4-9. Potteiger also accused Plaintiff of having a "bad attitude" and not being a "team player." *Id.* at 200:10-23. He told her she needed to make up for the work that she had lost by not being there, and she should not expect other people to do her work. *Id.* at 131:3-14. Potteiger also asked Plaintiff, "Who is your immediate supervisor?" *Id.* at 138:3-4. Plaintiff responded, "Mark Hammett," to which Potteiger replied, "Oh, it's not Mr. Senator Simpson?" *Id.* at 137:18-138:8.

Later, Hammett came to Plaintiff's office and told her that Potteiger had canceled the meeting, because Potteiger understood that Plaintiff was "on board." *Id.* at 165:1-8. Plaintiff took Hammett's statement to mean that she agreed with Potteiger's statements on the phone call, and she was going to behave herself. *Id.* at 165:9-21. After this conversation, Plaintiff testified she "needed to get out of the building" and "needed to get away from Mr. Hammett and Mr. Potteiger" because she "was getting angry," "felt like [she] was losing personal control," and was afraid she "was going to say something stupid." *Id.* at 166:11-22. Plaintiff informed Hammett that she "wasn't feeling very well" and needed to go home, and then she left work. *Id.* at 166:23-167:8.[3]

Plaintiff then requested FMLA leave, which Potteiger approved. *Id.* at 167:15-23. Plaintiff was hospitalized and held for psychiatric evaluation for three days following the January 14 events. *Id.* at 169:3-23. At some point in 2013, Plaintiff called and asked Jeri Norvel at ODVA about

---

[3] Plaintiff attempts to "dispute" several of Potteiger's Undisputed Material Facts pertaining to the events of January 14, 2013. *See* ECF No. 58 at 8, 10 (disputing Potteiger's Undisputed Material Fact Nos. 23-27). However, Plaintiff does not cite to any record evidence suggesting that the events occurred any differently than as stated in Potteiger's Undisputed Material Facts, which derive from Plaintiff's own deposition testimony. Therefore, the Court deems these facts to be uncontroverted. *See* Fed. R. Civ. P. 56(c), 56(e); LCvR 56.1(c).

returning to light duty. *Id.* at 168:2-10. Ms. Norvel told Plaintiff that Potteiger had said Plaintiff was to come back "at a hundred percent or not come back at all." *Id.*

Plaintiff remained on FMLA or other leave through the rest of 2013, with Potteiger approving Plaintiff's leave requests throughout the year. *Id.* at 170:14-171:4. In March 2013, Potteiger approved donated leave from Plaintiff's husband, Wayne Hibben, for 480.03 hours of annual leave and 362.47 hours of sick leave. ECF No. 49-10 (Donation of Shared Leave form). On June 26, 2013, after Plaintiff had visited an ODVA resident, Potteiger sent Plaintiff a letter reminding her of the ODVA policy prohibiting fraternization with residents to the point of becoming personally involved. ECF No. 49-9 (Letter dated June 26, 2013); Pl. Dep. at 173:22-174:11, 177:18-178:16.[4] On July 2, 2013, Potteiger denied Plaintiff's request for use of any additional shared leave, and he notified her that she would be in a "Leave Without Pay" status after July 8, 2013. ECF No. 49-11 (Letter from Jeri Norvel to Plaintiff dated July 2, 2013). Potteiger then approved Plaintiff's request for leave without pay. Pl. Dep. at 216:12-217:9.

Over the summer of 2013, Plaintiff's office was cleaned out, and Plaintiff's personal items were sent to her home. *Id.* at 171:5-172:5. Plaintiff admits that Potteiger did not direct anyone to clean out Plaintiff's office, and she testified that Potteiger did not himself clean out her office and that she has no evidence the cleaning was done as retaliation. ECF No. 49 at 9 (Potteiger Undisputed Material Fact 62); Pl. Dep. at 172:6-172:17, 199:2-11.[5] Plaintiff further admits that

---

[4] Plaintiff attempts to "dispute" this fact as stated in Potteiger's Undisputed Material Fact 34. *See* ECF No. 58 at 10. However, Plaintiff does not state how the fact is disputed or cite to any evidence in support of the dispute. Plaintiff's own deposition testimony and the June 26, 2013 letter support this fact. Therefore, the Court will deem this fact to be uncontroverted. *See* Fed. R. Civ. P. 56(c), 56(e); LCvR 56.1(c).

[5] Plaintiff attempts to "dispute" whether Potteiger in fact cleaned out Plaintiff's office or whether Plaintiff has any evidence that the cleaning was meant as retaliation, as stated in Potteiger's Undisputed Material Facts 61 and 64. *See* ECF No. 58 at 10. However, Plaintiff does not state how the facts are disputed or cite to any evidence to support the dispute. Plaintiff's own deposition testimony supports

Potteiger did not harass Plaintiff's husband in 2013 and that Potteiger never commented on her husband's hearing loss. ECF No. 49 at 9 (Potteiger Undisputed Material Facts 59, 60); Pl. Dep. at 198:24-199:1, ECF No. 49-16 (Wayne Hibben Deposition) at 60:15-17.

On September 5, 2013, Potteiger sent Plaintiff a letter notifying her that ODVA had received a statement from Plaintiff's doctor, John Marouk, confirming that Plaintiff could return to full duty without restriction. ECF No. 49-12 (Letter from Potteiger to Plaintiff dated Sept. 5, 2013). In the letter, Potteiger instructed Plaintiff to return to work by September 16, 2013, and to attend orientation. *Id.* The letter warned that if Plaintiff did not return to work by that date, "further action" would be warranted. *Id.* Plaintiff did not return to work by that date, because she "wasn't going to give [Potteiger] a chance to harass [her] anymore" and because she "found it funny" that he would require her to attend orientation. Pl. Dep. at 222:19-23, 224:14-19.[6] Plaintiff did not call Potteiger in response to the September 5 letter or make any inquiry regarding the orientation. *Id.* at 224:20-24. Plaintiff testified she believes she sent him a letter in response by registered mail, although she does not recall whether she sent the letter before or after receiving the return-to-work letter. *Id.* at 224:25-226:3.

Plaintiff admits that she effectively abandoned her position at the Claremore ODVA facility in September 2013. ECF No. 49 at 6 (Potteiger Undisputed Material Fact 35); Pl. Dep. at 226:17-20. In September 2013, Plaintiff began working part time as a telemarketer for MicahTek. Pl. Dep. at 118:25-119:12. On October 7, 2013, Potteiger sent Plaintiff a letter notifying her that

---

these facts. Therefore, the Court will deem these facts to be uncontroverted. *See* Fed. R. Civ. P. 56(c), 56(e); LCvR 56.1(c).

[6] Plaintiff attempts to "dispute" this fact as stated in Potteiger's Undisputed Material Fact 47. *See* ECF No. 58 at 10. However, Plaintiff does not state how the fact is disputed or cite to any evidence in support of the dispute. Plaintiff's deposition testimony and the September 5, 2013 letter support this fact. Therefore, the Court will deem this fact to be uncontroverted. *See* Fed. R. Civ. P. 56(c); LCvR 56.1(c).

ODVA was accepting Plaintiff's notice of retirement, with an effective date of January 1, 2014, and authorizing Plaintiff's leave without pay through December 31, 2013. *Id.* at 227:4-228:18.[7]

Plaintiff filed her Petition in this case on January 26, 2016. ECF No. 2 at 4. In the Petition, Plaintiff asserted a total of five causes of action against Potteiger and the State of Oklahoma ex rel. Department of Veterans Affairs a/k/a Claremore Veterans Center ("State"). The defendants removed Plaintiff's action to this Court and moved to dismiss Plaintiff's claims against them. The Court granted the motion in part, dismissing the sole claim against the State and dismissing Plaintiff's claim against Potteiger for interference under the Family and Medical Leave Act of 1993 ("FMLA"). *See* ECF No. 30. The Court denied the remainder of Potteiger's motion to dismiss. As a result, Plaintiff has four remaining claims against Potteiger: (1) retaliation under the FMLA (Count I); (2) retaliation against Plaintiff for exercising her free speech rights under the First Amendment to the United States Constitution, actionable through 42 U.S.C. § 1983 (Count II); (3) intentional infliction of emotional distress (Count IV); and (4) malicious interference with a contractual relationship (Count V). ECF No. 2 ¶¶ 9-37. Plaintiff seeks actual and punitive damages against Potteiger.

Potteiger has now filed a Motion for Summary Judgment on the remaining claims against him. ECF No. 49. Plaintiff filed a Response and Objection in Opposition (ECF No. 58), and Potteiger filed a Reply (ECF No. 61). Potteiger's Motion is fully briefed and ripe for review.

---

[7] In the "Material Facts" section of her response brief, Plaintiff's highlights Potteiger's repeated failure at his deposition to remember events or to understand counsel's questions. *See* ECF No. 58 at 3-6. Plaintiff titles this section, "Defendant's Lack of Candor Suggests Wrongful Conduct and a Cover-Up." The Court does not credit Plaintiff's attempt to emphasize Potteiger's "severe case of selective amnesia" and "complete lack of candor" during his deposition. *Id.* at 3. It is not appropriate on a motion for summary judgment for the Court to evaluate witness credibility based on mere perception, as it appears Plaintiff is asking the Court to do. *See Fogarty v. Gallegos*, 523 F.3d 1147, 1165 (10th Cir. 2008) ("On summary judgment, a district court may not weigh the credibility of the witnesses."). Further, Plaintiff points to no specific grounds or portions of the record that would raise a material question regarding Potteiger's credibility. *See* LCvR 56.1(c).

## II.    Summary Judgment Standard

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A dispute is genuine if the evidence is such that "a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A fact is material if it "might affect the outcome of the suit under the governing law."  *Id.*  As the court makes this determination, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Id.* at 255.

However, a party opposing a motion for summary judgment may not simply allege there are disputed issues of fact; rather, the party must support its assertions by citing to the record or by showing the moving party cannot produce admissible evidence to support the fact.  Fed. R. Civ. P. 56(c); *see Cone v. Longmont United Hosp. Ass'n*, 14 F.3d 526, 530 (10th Cir. 1994) ("Even though all doubts must be resolved in [the non-movant's] favor, allegations alone will not defeat summary judgment.") (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)).  Moreover, "[i]n a response to a motion for summary judgment, a party cannot rely on ignorance of facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial."  *Conaway v. Smith*, 853 F.2d 789, 794 (10th Cir. 1988) (citations omitted).  Thus, the inquiry for this Court is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Anderson*, 477 U.S. at 251-52.

## III.    FMLA Retaliation

### A.    Qualified Immunity

Potteiger argues he is entitled to qualified immunity from Plaintiff's FMLA retaliation

claim against him in his individual capacity. "The doctrine of qualified immunity shields government officials performing discretionary functions from liability for damages 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Boles v. Neet*, 486 F.3d 1177, 1180 (10th Cir. 2007) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Accordingly, when the affirmative defense of qualified immunity is at issue, the plaintiff bears the burden to show (1) the defendant's conduct violated his constitutional or statutory rights, and (2) those rights were clearly established at the time of the defendant's alleged misconduct. *T.D. v. Patton*, 868 F.3d 1209, 1220 (10th Cir. 2017) (quotations omitted). "This is a heavy burden. If the plaintiff fails to satisfy either part of the inquiry, the court must grant qualified immunity." *Carabajal v. City of Cheyenne*, 847 F.3d 1203, 1208 (10th Cir. 2017) (citation omitted).

Potteiger argues he is entitled to qualified immunity from Plaintiff's FMLA retaliatory discharge claim, because Tenth Circuit law did not "clearly establish," in 2012 or 2013, that an individual supervisor could qualify as an "employer" under the FMLA. An FMLA retaliation claim under 29 U.S.C. § 2615(a)(2) can be brought only against the claimant's "employer," which is defined in the statute to include "any person who acts, directly or indirectly, in the interest of an employer to any of the employees of such employer" and "any 'public agency.'" 29 U.S.C. § 2611(4)(A); *see* 29 U.S.C. § 2615(a)(2) ("It shall be unlawful for any *employer* to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter.") (emphasis added). This definition may allow some individual public employees to qualify as an "employer" under the FMLA, although the Tenth Circuit has not squarely answered this question. *See Owens v. City of Barnsdall*, No. 13-cv-749-TCK-PJC, 2014 WL 2197798, at *6 (N.D. Okla. May 27, 2014) (collecting cases and concluding, in the absence of express Tenth

Circuit guidance, that an individual public employee may be held liable as an "employer" under the FMLA if that individual acts, directly or indirectly, in the interest of an employer to any of the employees of such employer); *Modica v. Taylor*, 465 F.3d 174, 186 (5th Cir. 2006) ("The most straight forward reading of the [statutory] text compels the conclusion that a public employee may be held individually liable under the FMLA.").

As this Court previously explained in the Order ruling on the motion to dismiss, Potteiger's argument is improperly framed as an argument regarding qualified immunity. *See* ECF No. 30 at 12-13 (citing *Gray v. Baker*, 399 F.3d 1241 (10th Cir. 2005)). In *Gray*, the individual defendants claimed they were subject to qualified immunity from an FMLA claim, because they did not qualify as an "employer" under the FMLA. 399 F.3d at 1245. The Tenth Circuit panel rejected the characterization of this argument as a "qualified immunity" argument, because qualified immunity "shields public officials from civil liability based on having acted in good faith in the exercise of their duties." *Id.* By contrast, the defendants' defense did not "hinge on their having acted in good faith in their dealings with" the plaintiff. *Id.* Instead, "the question of whether the defendants are subject to individual liability under the FMLA is one of statutory construction that has no bearing on the decisions defendants made with respect to [the plaintiff]." *Id; see also Radeker v. Elbert Cnty. Bd. of Comm'rs*, No. 14-CV-1238-CMA-KMT, 2016 WL 1586391, at *3 (D. Colo. Apr. 19, 2016) ("In accordance with *Gray*, the Court finds that Defendants' argument that they do not have individual liability under the FMLA cannot legitimately be characterized as a claim of qualified or good faith immunity.") (quotations omitted). Potteiger does not attempt to distinguish *Gray* or this Court's previous opinion on the same issue. The Court identifies no reason

to depart from its previous ruling and concludes that Potteiger is not entitled to qualified immunity.[8]

## B. Prima Facie Case

On the merits of the claim, Potteiger contends the undisputed facts show Potteiger did not violate Plaintiff's rights under the FMLA. To establish a prima facie case of retaliation under the FMLA, a plaintiff must show (1) she engaged in a protected activity by taking FMLA-protected leave; (2) the employer "took an action that a reasonable employee would have found materially adverse;" and (3) a causal connection exists between the protected activity and the adverse action. *Campbell v. Gambro Healthcare, Inc.*, 478 F.3d 1282, 1287 (10th Cir. 2007). Once a plaintiff establishes a prima facie case, the burden shifts to the defendant to offer a legitimate, non-retaliatory reason for the adverse action. *Metzler*, 464 F.3d at 1170. The plaintiff then bears the burden of showing the defendant's stated reason is pretextual. *Id.*

It is undisputed that Plaintiff engaged in protected activity by taking FMLA leave in 2012 and 2013, which satisfies the first element. With respect to the second element, Plaintiff contends she was subject to a materially adverse action when Potteiger (1) admonished her over the telephone on January 14, 2013; (2) selectively applied the non-fraternization policy to Plaintiff; (3) had Plaintiff's office cleared out; (4) denied Plaintiff's request for light or restricted duty; and

---

[8] Potteiger makes no specific arguments challenging the legal conclusion that an individual supervisor qualifies as an "employer" under current law, except to characterize such a conclusion as an "absurdity." ECF No. 49 at 17. Even if Potteiger had adequately raised this argument, the Court would reject it. *See Cordova v. New Mexico*, 283 F. Supp. 3d 1028, 1038 (D.N.M. 2017) (explaining that "the majority of district courts within the Tenth Circuit that have considered the issue have concluded that the FMLA allows for the individual liability of supervisory public employees" and following majority position).

(5) denied Plaintiff's second request to use donated paid leave in 2013.[9] Potteiger argues that none of these actions, viewed singly or in the aggregate, was materially adverse under the governing standard.

The Tenth Circuit takes a liberal approach to the phrase "adverse employment action" but has not defined a "set rule" regarding what constitutes an "adverse employment action," instead taking a case-by-case approach. *Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1178 (10th Cir. 1999).[10] To constitute actionable retaliation, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from" asserting her FMLA rights. *Burlington N. & Santa Fe Ry. Co. v. White,* 548 U.S. 53, 68 (2006) (quotations omitted). The employer's action must result in *material* harm to the employee, meaning "significant" rather than "trivial" harm. *Id.* at 68; *see Lara v. Unified Sch. Dist. #501*, 2008 WL 11378842, at *6 (D. Kan. Aug. 13, 2008), *aff'd*, 350 F. App'x 280 (10th Cir. 2009).

This test is an objective standard, referring to the actions of a "reasonable" employee. *Lara*, 2008 WL 11378842, at *6 (citing *Burlington*, 548 U.S. at 68). In applying this test, the court must focus "on the materiality of the challenged action and the perspective of a reasonable person in the plaintiff's position" in order to "screen out trivial conduct while effectively capturing those acts that are likely to dissuade employees" from engaging in protected activity. *Burlington*, 548 U.S. at 69-70. The Tenth Circuit has recognized that a retaliation claim cannot be based on perceived infringement of a "general civility code" or make actionable the "ordinary tribulations of the

---

[9] Plaintiff admits that Potteiger did not harass her husband or comment on her husband's hearing loss. *See* ECF No. 49 at 9 (Potteiger's Undisputed Material Fact Nos. 59, 60). Accordingly, the Court will not further address this particular issue as it pertains to her FMLA retaliation claim.

[10] *Anderson* addressed a retaliation claim under the Americans with Disabilities Act, which uses the same analytical framework as that employed in an FMLA retaliation case.

workplace." *Anderson*, 181 F.3d at 1178 (quotations omitted). With this standard in mind, the Court examines each of the four alleged incidents of retaliation.

### 1. January 14, 2013, Telephone Conversation

Plaintiff contends that Potteiger's verbal admonitions and threats on a single phone call constituted unlawful retaliation for her protected activity. On January 14, 2013, Potteiger informed Plaintiff over the telephone that she could not bring a witness to her meeting with Hammett; he told Plaintiff she needed to "straighten up" and "knock it off" or she would not be around much longer, which Plaintiff interpreted to mean, "[c]ome to work and do your job"; he accused Plaintiff of having a "bad attitude" and not being a "team player"; he told her she needed to make up for the work that she had lost by not being there and should not expect other people to do her work; and he asked Plaintiff who her immediate supervisor was and suggested it was Senator Simpson.

In this instance, no reasonable jury could find Potteiger's verbal admonitions and threat to Plaintiff's job to be materially adverse. Without more, a reasonable employee who heard Potteiger's words on a single phone call would not have been dissuaded from taking FMLA leave in the first place. The Tenth Circuit has suggested that "unsubstantiated oral reprimands" and "unnecessary derogatory comments" are not themselves sufficiently adverse to support a retaliation claim. *Wells v. Colorado Dep't of Transp.*, 325 F.3d 1205, 1214 (10th Cir. 2003) (quotations and alterations omitted); *see Steele v. Kroenke Sports Enterprises, L.L.C.*, No. 05-CV-00456-PSF-MJW, 2006 WL 2038517, at *8 (D. Colo. July 18, 2006) (supervisor's verbal warning and threat to discipline plaintiff for taking FMLA leave were insufficient to constitute unlawful FMLA retaliation), *aff'd on other grounds,* 264 F. App'x 735 (10th Cir. 2008). Potteiger's admonitions fall into the nonactionable category of "petty slights and minor annoyances that often take place at work and that all employees experience." *Burlington*, 548 U.S. at 68.

Further, there is no evidence that Potteiger followed through on his verbal warning or that Plaintiff suffered any adverse employment impact as a result of the phone call. Shortly after the phone call on January 14, 2013, Plaintiff left work and requested FMLA leave, which Potteiger promptly approved. Pl. Dep. at 167:15-23. Although Plaintiff was hospitalized for psychiatric evaluation shortly after the phone call, such a reaction (even assuming it was attributable to Potteiger's verbal admonitions) is not one a "reasonable employee" would have experienced. Accordingly, there is no evidence that the phone call was "materially adverse," in the sense that it would have dissuaded a reasonable employee from asserting her FMLA rights. Indeed, the phone call did not dissuade Plaintiff from asserting and receiving FMLA leave from Potteiger.

## 2. Non-Fraternization Policy Letter

On June 26, 2013, Potteiger sent Plaintiff a letter, which reiterated the ODVA policy prohibiting fraternization with residents to the point of becoming personally involved and clarified that an ODVA employee "is not permitted to be on the grounds" except when on duty or conducting business with a supervisor or administrator. ECF No. 49-9 (Letter dated June 26, 2013). Plaintiff received the letter after she went to visit an ODVA resident. Pl. Dep. at 173:22-174:11, 177:18-178:16. Plaintiff contends this letter was retaliatory, because the cited policy does not prohibit visiting residents, only "fraternizing with residents to the degree of becoming personally involved." ECF No. 49-9 (Letter dated June 26, 2013). Plaintiff further contends the policy was selectively enforced against her, because other ODVA employees visited residents outside of work without recourse.

Plaintiff offers no evidence to suggest that a reasonable employee would have found Potteiger's letter to be materially adverse, *i.e.*, that it might have dissuaded a reasonable worker from asserting her FMLA rights. Plaintiff was already on FMLA leave at the time Potteiger sent

the letter, and Plaintiff does not indicate any further action was taken as a follow-up to the letter or that the letter had any connection to Plaintiff's FMLA leave. In addition, even if other ODVA employees were improperly visiting residents but were not reprimanded, Plaintiff provides no evidence to suggest Potteiger was aware of such visits. By contrast, Potteiger testified at deposition that he instructed "numerous" other employees not to visit residents. ECF No. 58-1 at 37:13-38:9. In short, Plaintiff offers no evidence to indicate that Potteiger treated Plaintiff any differently from other employees with respect to visiting residents outside of work hours. Accordingly, the Court concludes the fraternization letter did not constitute a materially adverse action for FMLA purposes.

### 3. Cleaning Out Plaintiff's Office

Plaintiff maintains that she suffered adverse action when her office was cleaned out in 2013. However, Plaintiff offers no evidence to link this event to Potteiger. Plaintiff testified that Potteiger did not himself clean out her office (Pl. Dep. at 199:2-11), and Plaintiff admits that Potteiger did not direct anyone to clean out Plaintiff's office in the summer of 2013 (Potteiger Undisputed Material Fact 62). Further, Plaintiff presents no evidence suggesting that the cleaning out of her office was retaliatory. Plaintiff testified that another employee was using her office space while Plaintiff was on leave and that none of her returned belongings were missing. Pl. Dep. at 171:5-172:14. Plaintiff also testified that she took no issue with her office space being used by someone else. *Id.* at 172:15-17. Clearing out an absent employee's office so that another employee could use the space, when that employee has been away on medical leave for several months, would not dissuade a reasonable employee from taking FMLA leave. Accordingly, the Court finds the clearing of Plaintiff's office was not a materially adverse action under the FMLA.

### 4. Denial of Light Duty or Restricted Duty

Plaintiff contends that she suffered adverse action when Potteiger denied her request to return to work on "light" or "restricted" duty. At some point in 2013, Plaintiff called and asked Jeri Norvel at ODVA about returning to light duty. Pl. Dep. at 168:2-10. Ms. Norvel told Plaintiff that Potteiger had said Plaintiff was to come back "at a hundred percent or not come back at all." *Id.* During her deposition, Plaintiff testified that she did not know what "light duty" would constitute for her, and that she did not inquire about any specific requests because she was told she had to return at one hundred percent, which she knew she could not do. *Id.* at 168:11-169:2.

Plaintiff does not attempt to explain how this action constitutes retaliatory conduct under the FMLA. Because the FMLA does not require an employer to accommodate an employee's medical restrictions upon a return to work, an employer's denial of such accommodation should not affect the employee's decision to take FMLA leave. While the FMLA does protect certain types of leave taken on an intermittent basis, Plaintiff was not requesting the ability to take intermittent leave. No reasonable jury could conclude that Potteiger's denial of Plaintiff's request for light or restricted duty was a materially adverse action, such that it would dissuade a reasonable employee from taking FMLA-protected leave.

### 5. Denial of Shared Leave

Plaintiff contends that she suffered a materially adverse action when Potteiger denied Plaintiff's second request for donated leave. Potteiger had approved 250 hours of donated leave from Plaintiff's husband in March 2013. ECF No. 49-10 (Donation of Shared Leave Form). On July 2, 2013, Potteiger denied Plaintiff's request for use of any additional shared leave, and he notified her that she would be in a "Leave Without Pay" status after July 8, 2013. ECF No. 49-11

(Letter from Jeri Norvel to Plaintiff dated July 2, 2013). Plaintiff then requested leave without pay, which Potteiger approved. ECF No. 49 at 7 (Potteiger's Undisputed Material Fact No. 43).

A reasonable employee would not be dissuaded from engaging in FMLA-protected conduct because her supervisor denied a request for use of donated leave, particularly after having already received 250 hours of donated leave. Again, Plaintiff does not attempt to explain how this action constitutes retaliatory conduct under the FMLA. The FMLA does not require an employer to approve use of "shared" or "donated" leave between employees. It is unknown why Potteiger denied Plaintiff's second request for donated leave, but there is no evidence in the record to suggest his motive was retaliatory. Even if, as Plaintiff claims, she understood there was no limit on receiving donated leave and other employees were willing to donate additional time (Pl. Dep. at 172:23-173:10), no reasonable employee would be dissuaded from taking FMLA leave upon learning that no further donated time would be allowed. No reasonable jury could conclude that Potteiger's denial of Plaintiff's request for use of additional donated leave was an adverse action, such that it would dissuade a reasonable employee from taking FMLA-protected leave.[11]

### 6. Aggregate Actions

Finally, Plaintiff argues that the five actions described above are materially adverse when viewed in the aggregate. The Court disagrees. The above actions, even taken in the aggregate, would not be "materially adverse to a reasonable employee." *Burlington*, 548 U.S. at 57. As for Potteiger's verbal and written warnings, there is no evidence of any further discipline or other adverse impact resulting from these incidents. As for cleaning out Plaintiff's office, denying her request for light duty, and denying her second request for shared leave, there is no evidence that

---

[11] The Court declines to reach Potteiger's alternative argument related to Plaintiff's failure to qualify as an "eligible employee" under the FMLA regulations. *See* ECF No. 49 at 15-17. The Court bases its summary judgment ruling solely on Plaintiff's failure to create a genuine issue of fact as to her prima facie case.

any of these events would dissuade a reasonable worker from taking FMLA-protected leave or that these events occurred as retaliation for her taking FMLA leave. Clearly, these events did not dissuade Plaintiff from taking FMLA leave, because she remained on FMLA or other medical leave through almost the entirety of 2013. Most of these events occurred while Plaintiff was already on leave.

In sum, no reasonable jury could find that any of the incidents of which Plaintiff complains are "materially adverse" for purposes of an FMLA retaliation claim. As a result, the Court's analysis of the FMLA retaliation claim ends here. The Court concludes Potteiger is entitled to summary judgment on Plaintiff's FMLA retaliation claim against him.

## IV.    Freedom of Speech Retaliation Claim

Plaintiff claims that Potteiger retaliated against her for exercising her free speech rights at a meeting with State Senator Frank Simpson. Specifically, Plaintiff alleges retaliation occurred on January 14, 2013, when Potteiger asked Plaintiff on a telephone call, "Who is your immediate supervisor?" Pl. Dep. at 138:3-4. When Plaintiff responded, "Mark Hammett," Potteiger replied, "Oh, it's not Mr. Senator Simpson?" *Id.* at 137:18-138:8. Plaintiff argues Potteiger was referring to the meeting that Plaintiff attended in December of 2012 at Eggbert's restaurant, at which employees discussed conditions at the Claremore ODVA facility and Plaintiff complained to Senator Simpson about harassment she had received from the ODVA administration. *Id.* at 138:19-139:4, 145:17-20. Plaintiff also appears to allege free speech retaliation occurred when (1) Potteiger sent her the July 2013 non-fraternization letter; (2) Potteiger had Plaintiff's office cleaned out; and (3) Potteiger denied Plaintiff's second request for shared leave.[12]

---

[12] Plaintiff's Response brief does not identify which events are allegedly retaliatory for engaging in free speech. The events identified in this section correspond to allegations in Plaintiff's Petition. ECF No. 2.

### A.      Standard of Review

A government employer "cannot condition public employment on a basis that infringes the employee's constitutionally protected interest in freedom of expression." *Connick v. Myers,* 461 U.S. 138, 142 (1983) (citations omitted).  Therefore, "it is firmly established that a public employer cannot retaliate against an employee for exercising her constitutionally protected right of free speech." *Lybrook v. Members of Farmington Mun. Sch. Bd. of Educ.*, 232 F.3d 1334, 1338 (10th Cir. 2000) (quotations and alterations omitted).  In accordance with this rule, the First Amendment protects statements by public employees on matters of public concern, even when such statements are directed at their superiors.  *See Pickering v. Bd. of Educ.,* 391 U.S. 563, 574 (1968).  On the other hand, the First Amendment does not permit public employees to "constitutionalize the employee grievance." *Garcetti v. Ceballos*, 547 U.S. 410, 420 (2006) (quotations omitted).

To balance the competing interests between an employee's right to free speech and the public employer's right to exercise "a significant degree of control over their employees' words and actions," the Tenth Circuit employs a five-prong test as set out in *Pickering* and *Garcetti*:

> (1) whether the speech was made pursuant to an employee's official duties; (2) whether the speech was on a matter of public concern; (3) whether the government's interests, as employer, in promoting the efficiency of the public service are sufficient to outweigh the plaintiff's free speech interests; (4) whether the protected speech was a motivating factor in the adverse employment action; and (5) whether the defendant would have reached the same employment decision in the absence of the protected conduct.

*Rohrbough v. Univ. of Colo. Hosp. Auth.*, 596 F.3d 741, 745 (10th Cir. 2010) (quotations omitted). The first three prongs are matters of law to be resolved by the court, while the final two prongs are ordinarily left to the fact finder.  *Id.*  "Implicit in the *Garcetti/Pickering* test is a requirement that the public employer have taken some adverse employment action against the employee." *Couch v. Bd. of Trustees of Mem'l Hosp. of Carbon Cnty.*, 587 F.3d 1223, 1235-36 (10th Cir. 2009) (quotations and alterations omitted).

The fourth prong of the *Garcetti/Pickering* test requires Plaintiff to establish a detrimental employment decision occurred. *Couch*, 587 F.3d at 1236. In determining whether Potteiger's alleged acts of retaliation could satisfy the fourth *Garcetti* prong, the Court must consider whether Potteiger's specific actions would "deter a reasonable person from exercising his . . . First Amendment rights." *Couch*, 587 F.3d at 1238. Although the Tenth Circuit has never delineated what actions constitute "adverse employment actions" in the First Amendment context, it has stated that First Amendment protection extends beyond employer conduct that would be actionable under Title VII, such as termination, suspension, or transfer in retaliation for making protected speech. *See Couch*, 587 F.3d at 1237; *Baca v. Sklar*, 398 F.3d 1210, 1220-21 (10th Cir. 2005). In addition to the severe actions that would support a claim under Title VII, certain types of less severe conduct can form the basis for a First Amendment claim. *See, e.g., Brammer–Hoelter v. Twin Peaks Charter Academy,* 492 F.3d 1192, 1208 (10th Cir. 2007) (poor performance ratings, increased restrictions on protected speech and association, and blacklisting from future employment could be actionable adverse employment actions for First Amendment purposes); *Schuler v. City of Boulder,* 189 F.3d 1304, 1310 (10th Cir.1999) (removing employee's job duties, issuing written reprimand, giving poor performance evaluation, and involuntarily transferring employee can be actionable in First Amendment context); *Baca,* 398 F.3d at 1221 (removal of supervisory responsibilities, deprivation of opportunity to supervise employee plaintiff had recruited, encouragement of employees to bypass plaintiff for supervision, reprimand in contravention of employer's protocol, and filing internal complaint against plaintiff and then using complaint to demand plaintiff's resignation, could constitute adverse employment actions in First Amendment context).

However, the Tenth Circuit has "never ruled that *all* [of an employer's acts], no matter how trivial, are sufficient to support a retaliation claim." *Lybrook,* 232 F.3d at 1340. In other words, "there may be some minor adverse actions that would not constitute First Amendment violations." *Id.* (quotations omitted). *See id.* at 1340-41 (requiring teacher to comply with professional development plan and to meet with her supervisor weekly, although "unwelcomed," "are of insufficient gravity to premise a First Amendment violation").[13]

### B.     Application of the *Garcetti/Pickering* Test

The parties disagree whether Plaintiff's speech at the December 2012 meeting is protected speech that satisfies the first three prongs of the *Garcetti/Pickering* test. The Court declines to reach those questions because, even assuming that Plaintiff's speech is protected, Plaintiff has failed to raise a genuine dispute on the fourth prong of the *Garcetti/Pickering* test – whether the action taken against her constitutes "adverse employment action."

Plaintiff's only verbal contact with Potteiger after her meeting with Senator Simpson was by telephone on January 14, 2013. On the call, Potteiger asked Plaintiff who her immediate supervisor was and stated, "Oh, it's not Mr. Senator Simpson?" Potteiger also told Plaintiff on the call to "straighten up" and "knock it off" or she would not be around much longer, which Plaintiff interpreted to mean, "come to work and do your job." Potteiger later approved Plaintiff's request for FMLA leave, and Plaintiff never returned to work after an extended period of FMLA leave. Over the summer of 2013, Potteiger sent Plaintiff a non-fraternization letter in response to her visiting an ODVA resident and denied Plaintiff's second request for donated leave. Plaintiff's office also was cleaned out over the summer of 2013, although Plaintiff has no evidence to indicate

---

[13] Potteiger's brief recites an incorrect standard of review for establishing an "adverse employment action" as part of a First Amendment retaliation claim. *See* ECF No. 49 at 19. Although Plaintiff does not challenge Potteiger's articulation of the standard, the Court rejects Potteiger's incorrect formulation.

Potteiger was involved in that incident. *See* Part I.C.3, above. None of these isolated incidents, taken separately or together, is sufficiently serious to rise to the level of an adverse employment action. A reasonable person would not be deterred from engaging in protected speech as a result of any of these incidents. Plaintiff's job responsibilities and benefits did not change following the meeting with Senator Simpson. In fact, Potteiger approved her requests for FMLA and other leave after that meeting. Potteiger also approved Plaintiff's first request for use of donated leave.

As explained above in Part I.C.2, Plaintiff admits Potteiger sent her the non-fraternization letter in response to her visiting a resident while on leave, and Plaintiff has no evidence to show that Potteiger treated her any differently than other employees who he knew visited residents when off-duty. Although the Tenth Circuit has stated that a letter of reprimand "may sometimes contribute to an adverse employment action, particularly in the context of other conduct," *Couch*, 587 F.3d at 1239, Plaintiff has failed to establish that the non-fraternization letter could be considered adverse action here. There is no evidence that Potteiger took any further action after sending the letter or that it formed a pattern of harassment against Plaintiff. *Cf. Baca,* 398 F.3d at 1221 (reprimand in contravention of employer's protocol, in conjunction with other conduct, was actionable); *Schuler*, 189 F.3d at 1310 (written letter of reprimand concerning employee's discussions of protected speech, as part of other extensive negative conduct, was actionable). Because no reasonable jury could find Plaintiff met the fourth prong of the *Garcetti/Pickering* test, Potteiger is entitled to summary judgment on Plaintiff's claim of First Amendment retaliation.

### C. Qualified Immunity

Potteiger also contends he is entitled to qualified immunity from personal liability for the § 1983 First Amendment claim alleged against him. *See* Part III.A (explaining standards governing qualified immunity). For reasons explained above, Plaintiff has failed to demonstrate

Potteiger violated Plaintiff's First Amendment rights by admonishing her verbally on January 14, 2013; by sending her a non-fraternization letter; by cleaning out her office; or by denying her shared leave. Plaintiff's failure to satisfy the first prong of the qualified immunity analysis renders it unnecessary for the Court to consider whether Plaintiff satisfied her burden under the second prong. *See Hinton v. City of Elwood, Kan.*, 997 F.2d 774, 780 (10th Cir. 1993).

## V. State Law Claims

### A. Oklahoma Governmental Tort Claims Act ("OGTCA") Immunity

Potteiger contends he is immune from suit with respect to Plaintiff's Oklahoma law claims for intentional infliction of emotional distress ("IIED") and malicious interference with a contractual relationship. Plaintiff's IIED and malicious interference claims are governed by Oklahoma law and subject to the provisions of the OGTCA, Okla. Stat. tit. 51, §§ 151 *et seq.* The OGTCA is the exclusive state-law remedy by which an injured plaintiff may recover against an Oklahoma governmental entity for its own torts and those of its employees. Okla. Stat. tit. 51 § 153(B); *Fuller v. Odom*, 741 P.2d 449, 451-53 (Okla. 1987). The OGTCA generally immunizes "the state, its political subdivisions, and all of their employees acting within the scope of their employment" from liability for torts. Okla. Stat. tit. 51, § 152.1(A). This immunity is subject to a limited waiver for the state and its political subdivisions, but "only to the extent and in the manner provided" in the OGTCA. *Id.* § 152.1(B).

Potteiger argues the limited waiver does not apply here, because he was a State of Oklahoma employee working within the scope of his employment at the ODVA. As Potteiger correctly points out, the OGTCA expressly precludes naming as defendant in a tort action "an employee of the state or of a political subdivision of the state acting within the scope of employment." *Id.* § 153(C). The OGTCA defines "scope of employment" as "performance by an

22

employee acting in good faith within the duties of the employee's office or employment or of tasks lawfully assigned by a competent authority . . . ."  Okla. Stat. tit. 51, § 152(12).  An employee's action "is not in the scope of employment if the employee acted maliciously or in bad faith." *Martin v. Johnson*, 975 P.2d 889, 895 (Okla. 1998) (citing *Nail v. City of Henryetta*, 911 P.2d 914, 916 (Okla. 1996)).

Plaintiff contends a factual issue remains as to whether Potteiger's conduct was in the scope of his employment.  However, Plaintiff does not explain what specific conduct occurred that fell outside the scope of Potteiger's employment.  In this case, Plaintiff identifies the following wrongful conduct that Potteiger committed  (described in greater detail above in Part I.C):  (1) a phone call on January 14, 2013, during which Potteiger told Plaintiff to "straighten up" and "knock it off" or she would not be around much longer; (2) sending a letter to Plaintiff notifying her of a non-fraternization policy at ODVA; (3) cleaning out of her office after Plaintiff had been absent from work for several months; (4) denial of Plaintiff's unspecified request for light or restricted duty upon her return to work; and (5) denial of Plaintiff's second request for use of donated leave. As evidence in support of summary judgment, Potteiger submitted an affidavit of Cindy Rogers, the administrator of the ODVA Claremore facility, stating that Potteiger's conduct in relation to Plaintiff "was pursuant to his good faith execution of his duties as an employee of the ODVA office, and was within the course and scope of his official duties."  ECF No. 49-14.

Based on the undisputed facts in the record, no reasonable jury could conclude that any of Potteiger's conduct toward Plaintiff occurred outside the scope of his employment.  Instead, all actions identified by Plaintiff were taken pursuant to Potteiger's official duties as an ODVA employee, and Plaintiff presents no facts to demonstrate Potteiger acted with malice or in bad faith. *See Carswell v. Okla. State Univ.*, 995 P.2d 1118, 1123 (Okla. 1999) (affirming grant of summary

judgment to defendants on Oklahoma tort claim where plaintiff failed to present "any factual or legal grounds supporting her argument that the employees acted maliciously or in bad faith").[14] As a result, Potteiger is entitled to OGTCA immunity from Plaintiff's state-law claims.[15]

Finally, to the extent Plaintiff maintains that Potteiger interfered with her retirement or terminated her employment at ODVA, Plaintiff presents no evidence to support either contention. Plaintiff testified that she effectively abandoned her job at ODVA and has no evidence that Potteiger terminated her or interfered with her retirement benefits request. Pl. Dep. at 226:17-20 ("Q: So put yourself in the shoes of Mr. Potteiger. How would he know that you had not abandoned your job after September 5th of 2013? A: He wouldn't."); *id.* at 236:21-237:1 (Q: "So you don't have any evidence one way or the other that [Potteiger] either tried to get [your retirement benefit] fixed or tried to prevent it from being fixed? A: I don't have any proof. Q: Okay. Do you have any evidence? A: No evidence."). Accordingly, Potteiger could not have acted outside the scope of employment with regard to Plaintiff's termination or retirement benefits.

## B.      IIED

Even if Potteiger were not immune from suit pursuant to the OGTCA, summary judgment would still be appropriate with respect to the IIED claim, because no reasonable juror could conclude that Potteiger's conduct satisfies the requirements for such a claim. To prove an IIED

---

[14] In the Statement of Facts section of her response brief, Plaintiff states Potteiger's "evasive deposition testimony" and his "conduct" demonstrate he was not acting in good faith for purposes of the OGTCA. ECF No. 58 at 10 ¶ 37. This bare statement is not supported by any admissible evidence. Therefore, the Court does not find the argument compelling.

[15] Potteiger further argues Plaintiff was required to give a notice of the tort claim pursuant to the OGTCA. However, the Oklahoma Supreme Court has held that the "[O]GTCA requirements for notice to government entities [do] not apply to an action brought against an employee in his or her individual capacity." *Pellegrino v. State of Okla. ex rel., Cameron Univ.*, 63 P.3d 535, 540 (Okla. 2003). This is because "[t]he notice provisions are designed to assist governmental interests, and not the interest of an employee acting outside the scope of his or her employment." *Id.* Accordingly, Plaintiff was not required to submit an OGTCA notice to Potteiger.

claim, a plaintiff must show "(1) the defendant's conduct was intentional or reckless; (2) the defendant's conduct was extreme and outrageous; (3) the defendant's conduct caused the plaintiff to suffer emotional distress; and (4) the plaintiff's emotional distress was severe." *Kiefner v. Sullivan*, 13-cv-714-TCK-FHM, 2014 WL 2197812, at *13 (N.D. Okla. May 27, 2014) (citing *Daemi v. Church's Fried Chicken, Inc.*, 931 F.2d 1379, 1387 (10th Cir. 1991)).

Potteiger contends that Plaintiff cannot satisfy the second element – of "extreme and outrageous" conduct – or the third element – that Potteiger caused Plaintiff's emotional distress. Extreme and outrageous conduct is "conduct which is 'so outrageous in character, and extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as utterly atrocious, and utterly intolerable in a civilized community.'" *McMullen v. City of Del City*, 920 P.2d 528, 531 (Okla. Civ. App. 1996) (quoting Restatement (Second) of Torts § 46, Comment *d* (1965)) (further citation omitted). "[L]iability clearly does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities." *Gabler v. Holder & Smith, Inc.*, 11 P.3d 1269, 1280 (Okla. Civ. App. 2000) (quotations omitted). IIED "does not provide redress for every invasion of emotional serenity or every anti-social act, and it does not protect mere hurt feelings, no matter how justified." *Miller v. Miller*, 956 P.2d 887, 900 (Okla. 1998) (citation omitted).

As Potteiger points out, workplace conduct rarely rises to the level of conduct required for an IIED claim. *See, e.g., Mirzae v. Smith Cogeneration, Inc.*, 962 P.2d 678, 682-84 (Okla. Civ. App. 1998) (employer's conduct was not extreme and outrageous when, among other things, manager made derogatory sexual comments about plaintiff and plaintiff's fiancee, woke plaintiff in the night to "browbeat him for hours" and make him do unnecessary work, loudly and publicly berated plaintiff during a work meeting, and terminated plaintiff's employment two hours before his wedding); *Anderson v. Okla. Temporary Servs., Inc.*, 925 P.2d 574, 577 (Okla. Civ. App. 1996)

(supervisor's conduct was not extreme and outrageous when, among other things, she exposed herself in the restroom, used profanity, made lewd remarks about plaintiff, and embarrassed plaintiff by discussing her faults with co-workers); *Eddy v. Brown*, 715 P.2d 74, 76-77 (Okla. 1986) (supervisor and foreman's conduct was not extreme and outrageous when, among other things, they ridiculed plaintiff, mimicked his speech impediment, and commented on his "stupid" behavior in workplace); *Merrick v. N. Natural Gas Co.*, 911 F.2d 426, 432-33 (10th Cir. 1990) (holding that "ordinary employer-employee conflict" involving insubordination, yelling, cursing, and hostile reactions did not support IIED claim). To satisfy the "extreme and outrageous" conduct element in the workplace context, the defendant must intentionally and persistently engage in a course of conduct that harms the plaintiff. *See Computer Publ'ns, Inc. v. Welton*, 49 P.3d 732, 736 (Okla. 2002) (finding jury question on IIED claim where supervisor harassed plaintiff "virtually non-stop" for two years after she quit her job, causing plaintiff to move and repeatedly change phone numbers).

Here, Plaintiff identifies one telephone call with Potteiger on January 14, 2013, during which Potteiger told her to "straighten up" and "knock it off" or she wouldn't be around much longer. Potteiger asked who Plaintiff's supervisor was, then asked, "Oh, it's not Senator Simpson?" Potteiger further accused Plaintiff of having a bad attitude and not being a team player. Potteiger's comments do not rise to the level of "extreme and outrageous" conduct going beyond all possible bounds of decency, as required for an IIED claim. Even if, as Plaintiff alleges, Potteiger was aware that Plaintiff had been diagnosed with a mental health disorder and his conduct toward her would exacerbate her condition (*see* ECF No. 2 ¶ 32), Potteiger's telephonic comments to her on a single occasion do not rise above the level of petty insults, threats, or indignities that an IIED claim cannot address. As for Potteiger's other conduct – the non-fraternization letter,

cleaning out Plaintiff's office, denial of light duty, and denial of donated leave – none of it is severe enough to rise to the level of "extreme and outrageous."  Plaintiff cites no legal authority that would support an IIED claim under the facts presented here.  Accordingly, and alternatively, Potteiger is entitled to summary judgment on Plaintiff's IIED claim for failure on the merits.[16]

### C.  Malicious Interference with a Contractual Relationship

As with the IIED claim, even if Potteiger were not immune from suit pursuant to the OGTCA, the Court finds that summary judgment would be appropriate with respect to the interference with contract claim.  To prove an interference with contract tort, a plaintiff must prove (1) that it had a business or contractual right with which there was interference; (2) that the interference was malicious and wrongful, and that such interference was neither justified, privileged, nor excusable; and (3) that damage was proximately sustained as a result of the complained-of interference.  *Navistar Int'l Transp. Corp. v. Vernon Klein Truck & Equipment*, 919 P.2d 443, 446 (Okla. Civ. App. 1994) (citing *Mac Adjustment, Inc. v. Property Loss Research*, 595 P.2d 427, 428 (Okla. 1979)) (further citation omitted).  "Malice" in this context means the "intentional performance of a wrongful act without justification or excuse."  *Id.* at 447 (quotations omitted).

In this case, Plaintiff presents no evidence that Potteiger interfered with Plaintiff's employment, either by terminating her employment or by restricting her return to work.  It is undisputed that Plaintiff failed to return to her job as instructed in September 2013.  Plaintiff testified she did not return because she "wasn't going to give [Potteiger] a chance to harass [her] anymore."  Pl. Dep. at 222:15-23.  Plaintiff went on to explain that she "found it funny" that

---

[16] Because the Court finds Plaintiff's IIED claim fails on the second element, the Court declines to examine whether Plaintiff could prove the third IIED element, that Potteiger caused Plaintiff's emotional distress.

Potteiger expected her to go through orientation upon her return to work, and she did not see why she needed to go through orientation after a nearly year-long absence. *Id.* at 224:7-19. Plaintiff did not inquire about the orientation requirement or contact ODVA to let them know she was not returning to work,[17] and she acknowledged that Potteiger would have no way of knowing she had not abandoned her job after September 5, 2013. *Id.* at 224:20-24, 226:17-20. Potteiger had approved all of Plaintiff's requests for FMLA and other leave in 2013 and, as explained above, Plaintiff has no evidence that Potteiger interfered with Plaintiff's receipt of her retirement benefits. Moreover, Plaintiff has made no showing here that Potteiger acted with malice toward Plaintiff, *i.e.*, that he intentionally performed a wrongful act without justification or excuse. Accordingly, and alternatively, Potteiger is entitled to summary judgment on Plaintiff's malicious interference with contract claim.

## VI.  Conclusion

For the reasons detailed above, Defendant Tim Potteiger's Motion for Summary Judgment (ECF No. 49) is **GRANTED**.

**SO ORDERED** this 14th day of January, 2019.

JODI F. JAYNE, MAGISTRATE JUDGE
UNITED STATES DISTRICT COURT

---

[17] Plaintiff testified she may have sent a letter to Potteiger explaining that she was not sure if she could return to her position as a nutrition assistant, but Plaintiff could not remember if she sent the letter before or after receiving Potteiger's letter instructing her to return to work. Pl. Dep. at 224:25-225:23.